# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**UNITED STATES OF AMERICA**

    **v.**

                                 **Criminal No. TDC-24-066**

**ANISSA MAROOF,**

    **Defendant.**

---

### RESPONSE OF THE UNITED STATES IN OPPOSITION
### TO DEFENDANT'S MOTION TO SUPPRESS SEARCH WARRANT RESULTS AND IN
### THE ALTERNATIVE FOR A *FRANKS* HEARING [ECF NO. 39]

### Table of Contents

INTRODUCTION ........................................................................................................................... 3

FACTUAL BACKGROUND ......................................................................................................... 3

  I. Investigation ...................................................................................................................... 3

    A. Origins of Investigation ............................................................................................... 3

    B. Law Enforcement Undercover ("UC") Operations ..................................................... 5

      i. UC-1 Visits ............................................................................................................. 5

      ii. UC-2 Visits ............................................................................................................. 9

      iii. Joint UC-1 and UC-2 Visits ................................................................................. 11

    C. Interviews with Other Patients .................................................................................. 13

    D. Search Warrants ......................................................................................................... 14

    E. Expert Reports ........................................................................................................... 16

**i. DEA Report** ............................................................................................. 16

**ii. FBI Report** ............................................................................................ 17

**PROCEDURAL BACKGROUND** ................................................................. 18

**ARGUMENT** .................................................................................................. 19

**I. Motion to Suppress Search Warrant** .................................................... 19

**A. Legal Standard** ...................................................................................... 19

**B. The Court should not suppress the fruits of the search warrants because the affidavit articulated probable cause for the warrants, and even if it did not, the good faith exception applies.** ................................................................ 21

**i. The affidavit contained probable cause to support obtaining the three warrants.** 21

**ii. The Defendant did not—and cannot—argue that the good faith exception does not apply.** ....................................................................................................... 24

**II. Franks Hearing** ...................................................................................... 25

**A. Legal Standard** ...................................................................................... 25

**B. The Defendant has failed to establish that Iacoviello "knowingly and intentionally, or with reckless disregard for the truth" omitted his educational and/or practical experience.** ................................................................................................. 25

**CONCLUSION** .............................................................................................. 28

## INTRODUCTION

The Court should deny defendant Anissa Maroof's ("Defendant's") motion to suppress search warrant results and in the alternative for a *Franks* hearing, ECF No. 39, because the affidavit supporting the search warrants contained probable cause.

## FACTUAL BACKGROUND

### I.   Investigation

#### A.  Origins of Investigation

At all times relevant to the Indictment, ECF No. 1, the Defendant was a licensed psychiatrist who operated a psychotherapy and opioid addiction treatment medical office in Bethesda, Maryland.  Ex. A, ¶ 17  (Iacoviello Affidavit in support of search warrants).[1]  She had an active medial license and a Drug Enforcement Administration ("DEA") registration number. *Id.*

The Defendant was also registered with the Substance Abuse and Mental Health Services Administration ("SAMSHA") which allowed her to prescribe buprenorphine as part of opioid use disorder treatment.  *Id.*  Buprenorphine is an opioid that can be used to treat opioid use disorder. *Id.* at ¶ 15(a).  Buprenorphine is available under various brand names, including Suboxone and Subutex.  *Id.*  As an opioid, buprenorphine acts as a central nervous system depressant.  *Id.* Although buprenorphine is used to treat opioid use disorder, because of buprenorphine's opioid effects, it can be abused.  *Id.*  Patients may also divert buprenorphine by selling it illegally.  *Id.*

---

[1] Since the filing of the Defendant's pre-trial motions, upon the government's motion, the Honorable Gina Simms, U.S. Magistrate Judge, unsealed the search warrants in this case as well as the affidavit.

In 2020, the Federal Bureau of Investigation ("FBI") Baltimore Field Office learned that the Defendant had been prescribing Subutex, Xanax, and Adderall to a large number of patients living in Clarksburg, West Virginia.  *Id.* at ¶¶ 18, 21.

Clarksburg is more than 230 miles from Bethesda, and it takes approximately three-and-a-half hours to drive from one place to the other.  *Id.* ¶ 18.  Between January 1, 2019 and October 13, 2020, the Defendant prescribed controlled substances to more than 50 patients who lived in West Virginia.  *Id.* at ¶ 20.  Those patients received monthly prescriptions for buprenorphine along with monthly prescriptions for Xanax and/or Adderall, and they filled their prescriptions in Maryland.  *Id.*  Such combinations lack a "legitimate medical purpose" and "are not supported as being adequately efficacious for psychiatric indications, and are associated with unacceptable risks of worsening addiction, diversion, psychiatric and medical morbidity, and mortality."  Ex. B, USA_000019 (Chambers DEA Report).

Then-FBI Task Force Officer ("TFO") Iacoviello has served as the lead case agent for this investigation.  Iacoviello worked at the Montgomery County Department of Police from 1990 to 2023.  Ex. C, USA_019953 (Iacoviello CV).  Between 2015 and 2023, he worked as a Detective with the Pharmaceutical Investigation Unit, Special Investigations Division.  *Id.* at USA_019953.  From 2017 to 2023, he worked as a TFO for the FBI, Baltimore Field Office.  *Id.* at USA_019958.

During his government service, Iacoviello worked on numerous investigations into doctors who were charged with illegal distribution of controlled substances.  *Id.* at USA_019958.  In 2013, he attended a National Association of Drug Diversion Investigators' training entitled "Pharmaceutical Drug Investigations and Identification."  *Id.* at USA_019955.  He received a commendation for a "Dirty Doctor Investigation" in 2018.  *Id.* at USA_019953.  In 2023, he

4

became a certified expert in Pharmaceutical Drug Investigations and Distribution. *Id.* at USA_019958.

## B. Law Enforcement Undercover ("UC") Operations

Starting in June 2021, the FBI sent two UC agents (UC-1 and UC-2) into the Defendant's medical office. The FBI recorded the interactions between the Defendant and UC-1 and UC-2.[2]

### i.   UC-1 Visits

The first agent ("UC-1") had a phone call with the Defendant before meeting her in person. Ex. A, ¶ 29 (Iacoviello Affidavit in support of search warrants). During the call, UC-1 told the Defendant he "took" whatever he could get from other people (i.e., through diversion), to which the Defendant asked if two or three doses of buprenorphine per day would be enough. *Id.* UC-1 responded that he wanted as much as possible, and the Defendant told him that she could issue him three doses per day at most. *Id.* The Defendant also told UC-1 not to "use" drugs illegally while taking Subutex (buprenorphine). *Id.* Also during the same call, the Defendant asked UC-1 whether he used controlled substances other than Subutex. *Id.* at ¶ 30. UC-1 told the Defendant that he smoked marijuana and that he had once tried heroin. *Id.* He also mentioned taking Adderall to stay awake after taking Subutex. *Id.* The Defendant agreed to prescribe UC-1 20mg doses of Adderall. *Id.*

During the same call, the Defendant asked UC-1 if he ever received professional psychotherapy, and UC-1 said he had not and did not want to. *Id.* at ¶ 31. At the end of the call, even though the Defendant had never previously met with UC-1 in person and had only spoken

---

[2] The government has provided all recordings to the Defendant, but cites to the search warrant affidavit here to minimize the number of exhibits that must be submitted with the government's briefing. The Defendant has not suggested that the search warrant misrepresents any of the UCs' interactions with the Defendant.

with UC-1 by telephone once, she told UC-1 that she would call in the two prescriptions, for buprenorphine and Adderall, to a specified pharmacy. *Id.* She also scheduled a follow-up office visit with UC-1 for early July 2021. *Id.* At the end of the call, the Defendant asked UC-1 to pay for the telephone call by credit card, but UC-1 explained that he did not have a credit card and needed to pay in cash. *Id.* at ¶ 32. The Defendant told UC-1 that he could drop payment at her office the following day. *Id.* UC-1 went to the Defendant's office and gave her $400 in cash. *Id.* UC-1 then went to the agreed upon pharmacy and obtained 90 tablets of 8mg buprenorphine (3 doses per day) and 60 tablets of 20mg Adderall (2 doses per day). *Id.*

On July 8, 2021, UC-1 went to the Defendant's office for a scheduled appointment. *Id.* at ¶ 34. UC-1 told the Defendant that the prescribed controlled substances were working, but that he had run out of his buprenorphine a week early after he had to "pay some people back" for giving him buprenorphine in the past. *Id.* Although UC-1 had admitted to diverting buprenorphine pills to other individuals illegally, the Defendant continued prescribing buprenorphine to UC-1. *Id.* UC-1 also complained of not being able to sleep "on demand," and he told the Defendant that a coworker had given him a Xanax pill, which he said "did the trick." *Id.* After the July 8 visit, the Defendant electronically sent prescriptions to a pharmacy for buprenorphine, Adderall and 1mg Xanax. *Id.* Before leaving her office, UC-1 paid the Defendant $250 in cash. *Id.* UC-1 then obtained the controlled substances from the designated pharmacy. *Id.*

On August 13, 2021, UC-1 had another appointment with the Defendant at her office. *Id.* at ¶ 35. During the appointment, the Defendant asked how everything was going, and UC-1 confirmed the Adderall was working well, as it was keeping him awake. *Id.* UC-1 complained to the Defendant that the Xanax was a "little weak" and that he needed to take two pills so that it "worked better" at getting him to sleep. *Id.* The Defendant offered to change the Xanax

prescription to either increase the number of 1mg pills or increase the dosage from 1mg to 2mg, ultimately agreeing to increase the dosage. The Defendant electronically sent new prescriptions for buprenorphine, Adderall, and 2mg Xanax to the pharmacy. *Id.* UC-1 paid $250 cash to the Defendant before leaving the office. *Id.* UC-1 then went to the designated pharmacy and obtained 90 tablets of 8mg buprenorphine, 30 tablets of 2mg Xanax, and 60 tablets of 20mg Adderall. *Id.*

On September 13, 2021, UC-1 went to another scheduled visit with the Defendant at her medical office. *Id.* at ¶ 36. The Defendant asked UC-1 how he was faring with the 2mg dosage of Xanax. *Id.* UC-1 told the Defendant that it worked well and "puts me out when I need to be." *Id.* The Defendant confirmed that UC-1 was sleeping better, was able to stay awake, and did not have relapses. *Id.*

During the September 13 visit, UC-1 said he had "another guy" to whom UC-1 gave some of his Adderall. *Id.* at ¶ 37. The other "guy" was UC-2. *Id.* The Defendant told UC-1 to have UC-2 text her because, according to the Defendant, UC-2 "needs his own." *Id.* After the visit, the Defendant electronically sent new prescriptions for buprenorphine, Adderall, and Xanax to the pharmacy. *Id.* UC-1 paid $250 cash to the Defendant and then went to the pharmacy and obtained 90 tablets of 8mg buprenorphine, 30 tablets of 2mg Xanax and 60 tablets of 20mg Adderall. *Id.*

On October 13, 2021, UC-1 went to another visit with the Defendant at her medical office. *Id.* at ¶ 38. The Defendant told UC-1 that she had already sent in his prescriptions. *Id.* UC-1 asked if one could develop tolerance to Xanax, and he complained that it was not working as well. *Id.* UC-1 commented that he needed to have a few beers some nights to be able to sleep. *Id.* UC-1 then asked if he could go up to 2 tablets a day and again mentioned he was drinking a few beers at night. *Id.* After UC-1 admitted that was drinking alcohol and using Xanax, the Defendant told

him, "Don't drink and take Xanax, ever . . . the two combine and you don't want to get in an accident." *Id.*  UC-1 said he did not drive at that point, and the Defendant warned that mixing Xanax with alcohol could cause blackouts. *Id.*

At the end of the visit, the Defendant sent an additional prescription for 2mg Xanax to the pharmacy and recommend that UC-1 should look for an alternative medication if he needed to continue to increase the dose. *Id.* at ¶ 39.  UC-1 paid the Defendant $250 cash prior to leaving the office, and he then went to the pharmacy and obtained 90 tablets of 8mg buprenorphine, 90 tablets of 2mg Xanax, and 60 tablets of 20mg Adderall.  *Id.*  The Defendant had originally prescribed 60 tablets of 2mg Xanax, but had increased by 30 tablets after the meeting. *Id.*

On November 10, 2021, UC-1 met with the Defendant at her office.  *Id.* at ¶ 45.  The Defendant reviewed UC-1's dosage of medications and asked about UC-1's sleeping and work patterns.  *Id.*  They had a brief discussion and then the Defendant electronically sent new prescriptions for buprenorphine, Adderall, and Xanax to the pharmacy.  *Id.*  UC-1 paid the Defendant $250 before he left her office.  *Id.*  UC-1 obtained 90 tablets of 8mg buprenorphine, 60 tablets of 2mg Xanax, and 60 tablets of 20mg Adderall from the pharmacy.  *Id.*

On April 22, 2022, UC-1 went to the Defendant's office for a scheduled appointment.  *Id.* at ¶ 50.  Before going into the office, UC-1 texted the Defendant asking if she was inside.  *Id.*  The Defendant responded that she was late.  *Id.*  After waiting several minutes, UC-1 told the Defendant that he had to leave.  *Id.*

The Defendant and UC-1 then had the following text exchange.

| Sender | Message |
|---|---|
| Defendant | If you need to go then as soon as I get to my office I can order your medicine |
| UC-1 | just need to get on road, could I leave money under the door. Can you send our script to that place |
| Defendant | No problem I will text you as soon as I send them into the pharmacy |

| UC-1 | great. How much money should I leave. I have [UC-2]'s money to |
| Defendant | $500 |

Following that message, UC-1 put $500 under the front door of the Defendant's office.  *Id.*  UC-1 and the Defendant then had the following exchange.

| Sender | Message |
| --- | --- |
| UC-1 | thanks doctor. The $500 is under the door. |
| Defendant | I got it. What is [UC-2]'s last name? |

UC-1 then went to the pharmacy where he got 90 tablets of 8mg buprenorphine, 60 tablets of 20mg Adderall, and 60 tablets of 2mg Xanax that the Defendant had issued.  *Id.*  While at the pharmacy, UC-1 confirmed with the pharmacist that the Defendant had electronically sent prescriptions for UC-2, but UC-1 did not pick them up.  *Id.*

### ii.    UC-2 Visits

UC-2 contacted the Defendant via text on October 19, 2021.  *Id.* at ¶ 40.  UC-2 explained that he was a friend of UC-1.  *Id.*  The Defendant and he scheduled an office visit.  *Id.*

Three days later, UC-2 met with the Defendant at her office.  *Id.* at ¶ 41.  When asked whether he used Subutex and Adderall, UC-2 told the Defendant that he was occasionally "hooked up" by UC-1.  *Id.*  Despite this statement by UC-2, the Defendant never took any action with respect to UC-1, nor declined to provide drugs to UC-2.  *Id.*

During the October 22, 2021 visit, the Defendant asked UC-2 why he wanted to be prescribed both Subutex and Adderall, and she explained that it would be an expensive regime and that "once you start it regularly, you can't, it's hard to come off."  *Id.* at ¶ 42.  UC-2 responded that it would not be a problem and requested the Defendant prescribe him Subutex, Adderall, and Xanax.  *Id.*  Upon questioning, UC-2 explained that he wanted all three controlled substances because he felt "blue" every now and then, but not to the point of feeling hopeless.  *Id.*  He also

told the Defendant that he used opiates once a month and thought Subutex would stabilize his mood, Adderall would keep him awake so that he could work, and Xanax would enable him to sleep. *Id.* The Defendant replied, "But then it's like you're using one thing to treat another thing to . . . I'm just trying to save you some money." *Id.* UC-2 told the Defendant that his sleep was inconsistent and also explained that he needed to drink beer to help him sleep. *Id.* The Defendant again asked why UC-2 would need Subutex, and UC-2 told her the three medications worked for his coworker (referring to UC-1) and they both "chase them same demons." *Id.* The Defendant warned that "these are three narcotics that you should only really take if you have to." *Id.* UC-2 stated that he also had to give some away to some people who had previously helped him out. *Id.*

After this exchange, the Defendant asked UC-2, "What if I just gave you enough for a month, like one a day, so I'll give you just 30. And then after that, you try and just take Adderall with Xanax." *Id.* at ¶ 43. The Defendant then added, "Cuz this isn't necessarily a treatment for depression and anxiety. It's more so for, you know, taking too many pain pills or heroin. It really just prevents withdrawal. It helps a little with mood but not a whole lot." *Id.* Despite these warnings, the Defendant gave UC-2 prescriptions for each of the requested substances: 30 tablets of 20mg Adderall, 30 tablets of 8mg buprenorphine, and 30 tablets of 1mg Xanax. *Id.* When putting in the electronic prescriptions, the Defendant told UC-2, "I'm gonna put a note when I write the Subutex that you're tapering off of it. And that you're only gonna get one per day so it doesn't look weird when next month, if you, you know, when you don't get it again. I really don't think you're gonna need it. You'll like how you feel with the Adderall and Xanax." *Id.* The Defendant instructed UC-2 not to combine Adderall with alcohol and also told him, "Don't let your medications get stolen. I don't fill prescriptions early." *Id.* UC-2 paid the Defendant $400 cash prior to leaving the office. *Id.*

On November 19, 2021, UC-2 met with the Defendant at her office. *Id.* at ¶ 46. UC-2 told the Defendant that the Subutex was working fine and asked for all "the same stuff." *Id.* The Defendant did not taper UC-2. *Id.* UC-2 asked the Defendant for two months of prescriptions due to increased work load and upcoming holidays. *Id.* The Defendant agreed to give UC-2 refills for the buprenorphine and Xanax, but she advised that she could not do so with the Adderall. *Id.* Before leaving her office, UC-2 paid $250 to the Defendant. *Id.* UC-2 went to the pharmacy and got 60 tablets of 8mg buprenorphine, 60 tablets of 2mg Xanax, and 30 tablets of 20mg Adderall. *Id.*

### iii.    Joint UC-1 and UC-2 Visits

On December 10, 2021, UC-1 and UC-2 went to the Defendant's office together. *Id.* at ¶ 47. Only UC-1 had scheduled an appointment, but the Defendant saw UC-1 and UC-2 at the same time. *Id.* The Defendant asked UC-1 and UC-2 if they both were going to get their medications on that day. The Defendant then asked UC-2 if he had already spoken to the pharmacist or if she needed to mark the prescriptions for an early fill. *Id.* UC-2 told her that the pharmacist would fill for him. *Id.* Although the Defendant had issued prescriptions for UC-2 less than a month earlier, and, at that time, had provided one-month refill authorization of the buprenorphine and Xanax prescriptions, the Defendant still electronically sent new prescriptions to the pharmacy for both UC-1 and UC-2. *Id.* The UCs each paid $250 to the Defendant. *Id.* The UCs went to the pharmacy. *Id.* UC-1 obtained 90 tablets of 8mg buprenorphine, 60 tablets of 2mg Xanax, and 60 tablets of 20mg Adderall. *Id.* UC-2 obtained 30 tablets of 8mg buprenorphine and 30 tablets of 1mg Xanax. *Id.* Again, UC-2 got refill authorization on the prescriptions for buprenorphine and Xanax. *Id.*

On January 14, 2022, the UCs went together to the Defendant's office for appointments. *Id.* at ¶ 48.  The Defendant met with both of them at the same time and said she only had a few minutes because "I had to squeeze you guys in."  *Id.* at ¶ 48.  The three briefly talked about the weather, Christmas, and toys.  *Id.*  The Defendant then told the UCs that she had electronically refilled medications for both the UCs.  *Id.*  UC-2 paid $500 to the Defendant to cover the appointments for both UCs.  *Id.*  After going to the pharmacy, UC-1 got 90 tablets of 8mg buprenorphine, 60 tablets of 2mg Xanax, and 60 tablets of 20mg Adderall.  *Id.*  UC-2 got 30 tablets of 8mg buprenorphine, 30 tablets of 1mg Xanax, and 30 tablets of 20mg Adderall.  *Id.*  Yet again, UC-2 got refill authorization on the prescriptions that the Defendant issued for him for buprenorphine and Xanax.  *Id.*

On February 11, 2022, the UCs went together to the Defendant's office for appointments. *Id.* at ¶ 49.  The Defendant saw them together and asked them both how they were doing.  *Id.*  UC-2 asked the Defendant to increase his Xanax dosage to 2mg.  *Id.*  Without following up on the request, the Defendant agreed.  *Id.*  UC-2 also asked the Defendant to authorize refills on his Xanax and buprenorphine, in addition to his prescriptions issued during that visit, because he would not be able to get to the Defendant's office the next month.  *Id.*

During the same visit, the Defendant told the UCs that she needed to do urinalysis tests, but did not have time to set them up.  *Id.*  While seeing the Defendant, neither UC-1 nor UC-2 ever took a urinalysis test.  *Id.*  UC-1 paid $500 to the Defendant to cover the appointment(s) for both UCs.  *Id.*  The UCs went to the pharmacy, and UC-1 obtained 90 tablets of 8mg buprenorphine, 60 tablets of 2mg Xanax, and 60 tablets of 20mg Adderall.  *Id.*  UC-2 obtained 30 tablets of 8mg buprenorphine, 30 tablets of 2mg Xanax, and 30 tablets of 20mg Adderall.  *Id.*  Again, UC-2 got refill authorization on his prescriptions for buprenorphine and Xanax.  *Id.*

### C.  Interviews with Other Patients

As part of the investigation, law enforcement conducted video-recorded interviews with more than ten of the Defendant's patients.  The government has produced all the recordings to the defense in discovery.  Five patients testified before the grand jury.  The government will produce those transcripts at or before the *Jencks* deadline.  Those interviews and grand jury testimonies show that the UCs' experiences with the Defendant were typical of patients' experiences with the Defendant.

West Virginia patients came to the Defendant after purchasing off the street controlled substances that she had prescribed to other individuals.  They saw the Defendant because they knew she would prescribe combinations of controlled substances that others would not.  She never asked them to undergo urinalysis.  They paid her in cash.  At times, she did not even see the patients, but instead they came to Maryland, dropped off cash at her office, were issued prescriptions by her, and then picked up their controlled substances at Maryland pharmacies.

Text messages recovered between the Defendant and her West Virginia patients also are similar to those she had with the UCs.

For example, the text messages indicate that the Defendant knew that her patients were selling prescriptions on the street.  Ex. D (Chat between the Defendant and -5601) ("One of your patients . . . is selling Her meds n trading them for cars n bill money").

She also knew that her patients were using illegal substances in combination with the controlled substances that she was prescribing.  In one text message exchange, a patient informed the Defendant that another patient had "beat the hell out of me yesterday morning he slapped me so hard a month ago on our way home from picking up our meds he's chipped 3 of my teeth he has taken so many Xanax on top of smoking meth . . . I prey [sic] he gets the help he needs from

all the drugs he does." Ex. E (Chat between the Defendant and -8359), USA_12572. The Defendant responded to this text message curtly with: "I don't know how to help you [Redacted] I don't think anyone will fill your scripts early." *Id.* at USA_12573.

Other text messages indicate that the Defendant filled prescriptions without seeing her patients. For example, on November 26, 2021 at 10:26 a.m., the Defendant texted a patient, "I don't just send scripts after being paid. I send them during or after an appointment where we talk." Ex. F (Chat between the Defendant and -8512), USA_012609. At 10:29 a.m., the patient replied, "I know i didn't get to talk to you last month or this month. . . . I'm willing to talk to you now if it would make you feel better and we can go ahead and set up our next appointment." *Id.* The Defendant did not reply with a message. At 1:16:24 p.m., the patient followed up, "I'm really not trying to inconvenience you. We've been hanging around for a while. I'm not trying to be a pain. I don't have a vehicle or a phone at the moment but [another patient] said i could use her if you want to call and talk to me and set up our appointment and do our consultation." *Id.* At 1:16:47 p.m., the Defendant replied, "I sent them a few mini ago." *Id.* at USA_012610. Based on the time stamps, the Defendant and the patient could not have talked before she sent in the prescriptions.

### D.  Search Warrants

On May 25, 2022 the Honorable Gina Simms, U.S. Magistrate Judge, authorized search warrants to search the Defendant's office, residence, and car. Iacoviello—then still a TFO—served as the affiant for the search warrants. For his training and experience—which is the primary aspect of the warrants that the Defendant contests—Iacoviello explained in the affidavit that he had "acquired extensive experience involving the characteristics of suspicious activities involving prescription drugs" and also had "experience regarding the practices and procedures of pharmacists and physicians in dispensing prescription drugs." Ex. A, ¶ 3 (Iacoviello Affidavit in

support of search warrants).  He further informed the Court that he had "participated in numerous investigations of the diversion of controlled substance pharmaceuticals, including the unlawful dispensation of controlled substances through a variety of fraudulent activities."  He added:  "I have been involved in the investigation, surveillance, and arrest of numerous persons involved in the diversion or distribution of prescription drugs.  I have also worked with and spoken with experienced drug investigators concerning the methods and practices of those engaged in the diversion of pharmaceuticals."  *Id.*  The affidavit made clear that "[t]he facts and information in this affidavit are based upon [the] affiant's personal knowledge of the investigation, information provided to [the] affiant by other law enforcement officers and agents, information provided by cooperating individuals, and other information gathered during the course of this investigation."  *Id.*  at ¶ 8.

Iacoviello explained that there was probable cause to believe that the Defendant had violated 21 U.S.C. § 841(a) (distribution and dispensing of controlled substances) and 21 U.S.C. § 843(b) (use of communication facilities to facilitate the commission of drug offenses).  *Id.* at ¶ 6.

Following this introduction, Iacoviello gave basic information about the three controlled substances of interest:  Buprenorphine, Benzodiazepines, and Amphetamines.  *Id.* at ¶¶ 12-15.  He also explained that "prescription drug abusers routinely abuse opioids, benzodiazepines and amphetamines in a variety of methods, to include consuming excessive quantities, crush[ing] and snorting them, and dissolving and injecting them."  *Id.* at ¶ 16.

To support a finding of probable cause, the affidavit described the Defendant's medical practice and licenses.  *Id.*  at ¶¶ 17-18.  It then provided an overview of the Defendant's prescribing practices to individuals from Clarksburg, West Virginia.  *Id.* at ¶¶ 19-24.  Next, the affidavit

outlined the communications and interactions between the UCs and the Defendant, including cellular communications.  *Id.* at ¶¶ 25-53.

### E.  Expert Reports

Dr. R. Andrew Chambers wrote two expert reports in this case.  Dr. Chambers is an Associate Professor of Psychiatry at the Indiana University School of Medicine.  He is a recognized expert in the field of addiction psychiatry and substance abuse disorder.  The government has notified the Defendant that it intends to call Dr. Chambers as an expert at trial.

### i.    DEA Report

On June 8, 2022, Dr. Chambers issued an expert report on the Defendant's prescribing practices at the request of the DEA.  Ex. B  (Chambers DEA Expert Report).  To write this report, Dr. Chambers reviewed the Defendant's Prescription Drug Monitoring Program ("PDMP") records from January 1, 2020 to March 23, 2022.  *Id.* at USA_000002.  Within her total PDMP records, Dr. Chambers randomly selected 259 of her patients.  *Id.* at USA_000012.

Based on his analysis of prescribing records, Dr. Chambers found that the Defendant's "prescribing patterns are extremely dangerous and marked by multiple excessive and problematic attributes that reflect a gross departure from legitimate medical, psychiatric, and especially— addiction psychiatry, practice standards."  *Id.* at USA_000018.  Dr. Chambers also concluded that the Defendant's prescribing practices were "particularly egregious for a physician who is trained and board certified as an addiction psychiatrist—whose mission is the exact opposite of what is happening in this data set—to prevent, treat and reduce addictions, especially the iatrogenic kind." *Id.* at USA_000021.  He continued, "There is no chance that a person with this training and certification could be acting professionally unaware of the risks to patients that the data set entails." *Id.*  Similarly, for the combinations of the controlled substances that the Defendant was

prescribing, Dr. Chambers found that "[n]one of these combinations (when maintained chronically, or outside of terminal illness care, or outside short-term inpatient medical or short-term outpatient-inpatient addiction/psychiatric care (e.g., for detoxification tapers)) has a legitimate medical purpose." *Id.* at USA_000019.

### ii.   FBI Report

On September 28, 2023, Dr. Chambers issued a second expert report on the Defendant's prescribing practices, this time at the request of the FBI.  Ex. G (Chambers FBI Expert Report Excerpts).[3]  In addition to the previous sources that he reviewed, before writing the second report, Dr. Chambers reviewed medical and text records for ten patients as well as the videos for the UCs. *Id.* at USA_001428-1429.

Based on this evidence, Dr. Chambers found that the Defendant "was totally and pervasively failing to provide professional medical expertise or legitimate treatment standards." *Id.* at USA_001437.  She instead appeared to "focus" on "procuring cash profits, extracted from patients who are by and large socio-economically disadvantaged people, and likely struggling with genuine mental health and addiction illnesses that she deliberately did not evaluate or treat." *Id.* at USA_001437.  Dr. Chambers also found that the Defendant was prescribing "large and dangerous quantities and combinations of drugs that can be expected to *worsen or cause mental illness and addiction*, not just in these patients but in family members and communities surrounding these patients." *Id.* at USA_001437 (emphasis in original).  He observed that the Defendant "focus[ed] on the key steps of commodity exchange, which is common in cases of doctors who are operating as drug dealers." *Id.*; *see id.* at USA_001438 ("The economic model of

---

[3] The government's exhibit contains only excerpts from the report, because much of the report discusses specific patients by name.  The Defendant has the entire report in discovery.

[the Defendant]'s business, which ties cash payments fairly strictly to the delivery of drugs (without the provision of medical expertise, or care, or medical charting, etc.) and the efforts of [the Defendant] that instead almost exclusively focuses on the delivery of scripts, logistics of pick-ups, and processing/accumulation of payments, makes this case essentially indistinguishable from large scale illicit street or organized crime-based drug dealing.").

## PROCEDURAL BACKGROUND

On February 28, 2024, a federal grand jury for the District of Maryland returned an eight-count indictment against the Defendant.  ECF No. 1.  The indictment charged the Defendant with seven counts of distribution and dispensing of controlled substances (Counts One through Seven), in violation of 21 U.S.C. § 841, and one count of maintaining a drug-involved premises (Count Eight), in violation of 21 U.S.C. § 856(a)(1).  The Defendant had her initial appearance on March 11, 2024 and was released with conditions.  ECF Nos. 7, 11.  The Defendant had her arraignment on April 1, 2024 and pled not guilty to all counts.  ECF No. 16.

On July 5, 2024, the Defendant moved to suppress the search warrant results and in the alternative for a *Franks* hearing.

## ARGUMENT

Iacoviello's affidavit detailed a long-term investigation into the Defendant's unlawful prescription practice, including summarizing multiple meetings that two UCs had with the Defendant. Thus, the affidavit supported probable cause to search the Defendant's residence, office, and automobile.

### I.       Motion to Suppress Search Warrant

#### A.  Legal Standard

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."   U.S. Const. amend. IV.    When reviewing the validity of a search warrant, the district court's role is "not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant."   *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984); *United States v. Lawlor*, 996 F.2d 1578, 1581 (4th Cir. 1993) (the question is "whether the magistrate judge had a substantial basis for the decision").

A court reviewing a probable cause determination "must consider only the information presented to the magistrate who issued the warrant."   *United States v. Wilhelm*, 80 F.3d 116, 118 (4th Cir. 1996).   In this regard, "[a]n accused is generally not entitled to challenge the veracity of a facially valid search warrant affidavit" by way of a motion to suppress.   *United States v. Pulley*, 987 F.3d 370, 376 (4th Cir. 2021) (quoting *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011)).   In other words, reviewing the magistrate judge's probable cause finding is generally limited to "the four corners of the application documents."   *United States v.*

*Somerlock*, 602 F. Supp. 3d 791, 799 (D. Md. 2022) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

The magistrate judge's decision to issue the warrant is given "'great deference,'" and it should not be invalidated "'by interpreting [an] affidavi[t] in a hypertechnical, rather than a common sense, manner.'"  *Lawlor*, 996 F.2d at 1581 (alterations in original) (quoting *Gates*, 462 U.S. at 236).  A determination of probable cause is "one on which 'reasonable and prudent people would rely.'"  *United States v. Jones*, 952 F.3d 153, 158 (4th Cir. 2020) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).   Probable cause plainly "exist[s] where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found."  *Ornelas v. United States*, 517 U.S. 690, 696 (1996).  The probable cause standard gives law enforcement officers "leeway to draw reasonable conclusions."  *Taylor v. Farmer*, 13 F.3d 117, 121-22 (4th Cir. 1993).

Even when a search warrant lacks probable cause, as long as officers are "reasonably relying on a warrant issued by a detached and neutral magistrate," the exclusionary rule does not apply because of the good-faith exception.  *United States v. Leon*, 468 U.S. 897, 913 (1984).  In *Leon*, the Supreme Court identified four instances where the good-faith exception did not apply:

1. "[T]he issuing magistrate wholly abandoned his judicial role";

2. The "warrant [is] so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid";

3. The "affidavit [is] so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or

4. "[T]he issuing judge 'was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth.'"

*United States v. Perez*, 393 F.3d 457, 461 (4th Cir. 2004) (quoting *Leon*, 468 U.S. at 923).

**B. The Court should not suppress the fruits of the search warrants because the affidavit articulated probable cause for the warrants, and even if it did not, the good faith exception applies.**

**i.   The affidavit contained probable cause to support obtaining the three warrants.**

Contrary to the Defendant's motion, ECF No. 39, Iacoviello's affidavit provided probable cause to support warrants to search her office, home, and automobile.  The affidavit described the relevant prescriptions at issue in this case and those substances' tendency to be abused.  *See* Ex. Ex. A, ¶¶ 12-16  (Iacoviello Affidavit in support of search warrants).  Then to support probable cause, the affidavit outlined four main categories of evidence.  *First*, it described how a deputy sheriff from Clarksburg, West Virginia had encountered several individuals in Clarksburg with "large amounts of prescription medication from **MAROOF**."  *Id.* at ¶ 18.  *Second,* the affidavit analyzed PDMP prescription data to establish that the Defendant had "prescribed [a] combination of buprenorphine, Adderall, and Xanax to numerous patients" from Clarksburg.  *Id.* at ¶¶ 20-23. *Third,* the affidavit described how based on physical surveillance, the Defendant was prescribing controlled substances to West Virginia patients who appeared not to be showing up for appointments.  *Id.* at ¶ 24.  *Fourth*, the affidavit described in detail the undercover operation that lasted over half a year.  *Id.* at ¶¶ 25-63.

The Defendant raises two main arguments for suppression,[4] both of which the Court should reject.  The Defendant argues that the affidavit is deficient because it did not allege that the

---

[4] The introduction to the motion suggests that the search warrants for the residence and the medical office should be suppressed as impermissible "general warrants" but then offers no argument on this point.  ECF No. 39 at 1-2.  The government notes that the affidavit contained an Attachment B, which restricted what could be searched for and seized during the execution of the warrants.  Ex. A (Iacoviello Affidavit in support of search warrants). The affidavit, including Attachment C, also discussed the specific patients whose records law enforcement sought to seize. *Id.*

Defendant subjectively knew that her conduct was without authorization. *See* ECF No. 39 at 1 (citing *Ruan v. United States*, 597 U.S. 450, 467 (2022)).  As an initial matter, *Ruan* addresses the issue of jury instructions and not what is required in a search warrant. *See* 597 U.S. at 454 (holding that "[a]fter a defendant produces evidence that he or she was authorized to dispense controlled substances, the Government must prove beyond a reasonable doubt that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so").  The Defendant does not cite—and the government has not found—a case applying *Ruan* to the search-warrant context.

Additionally, the Court explained in *Ruan* that "[t]he Government, of course, can prove knowledge of a lack of authorization through circumstantial evidence." *Id.* at 467.  The affidavit provided such circumstantial evidence by, at minimum, detailing how (1) the Defendant prescribed Subutex and Adderall to UC-1 after just a brief phone call, (2) the Defendant prescribed buprenorphine to UC-1 on July 8, 2021 even after he admitted to giving away some of it, (3) the Defendant prescribed Adderall to UC-1 on September 13, 2021 even after he admitted to giving some of it away to another person; (4) the Defendant prescribed Xanax to UC-1 on October 13, 2021 even after he admitted drinking and taking Xanax, which as the Defendant recognized could cause blackouts; (5) the Defendant prescribed buprenorphine, Xanax, and Adderall on April 22, 2022 without first seeing UC-1 at his scheduled appointment; (6) the Defendant increased UC-2's Xanax dosage on February 11, 2022 at UC-2's request; and (7) the Defendant never performed urinalysis on either UC.  Ex. A, ¶¶ 31, 34, 37, 38, 49 50 (Iacoviello Affidavit in support of search warrants).

The Defendant also argues that the affiant lacked the qualifications to render the opinions contained in the affidavit.  ECF No. 39 at 7.  The Fourth Amendment, however, does not require "that an affiant marshal trial-worthy proof or have the expertise of a high-level scientist for a judge

to issue a search warrant in a drug investigation.  Such qualifications are irrelevant." *United States v. Wolfe*, No. 4:14CR152 RWS/NCC, 2016 WL 8310382, at *4 (E.D. Mo. Dec. 14, 2016) (rejecting argument that DEA special agents were not qualified to discuss controlled substance analogues); *see also United States v. Stephens*, No. 2:14CR00001, 2014 WL 4955713, at *3 (W.D. Va. Oct. 1, 2014) (rejecting motion to suppress based on argument that "agents lacked the requisite scientific training to discern whether the substances at issue were indeed controlled substance analogues").

In *Wolfe*, the district court ruled that it was sufficient for officers with "extensive training and experience, individually and collectively, with numerous drug investigations and economic crimes related to drug trafficking" to swear out the warrants.  2016 WL 8310382, at *5.  In the instant case, Iacoviello explained at the beginning of the affidavit that he had "acquired extensive experience involving the characteristics of suspicious activities involving prescription drugs."  Ex. A, ¶ 3 (Iacoviello Affidavit in support of search warrants).  He also had "experience regarding the practices and procedures of pharmacists and physicians in dispensing prescription drugs" and had "participated in numerous investigations of the diversion of controlled substance pharmaceuticals, including the unlawful dispensation of controlled substances through a variety of fraudulent activities."  *Id.*  Further, the affidavit was not limited to his personal knowledge, but also included information from "other law enforcement officers and agents[,] . . . cooperating individuals, and other information gathered during the course of this investigation."  *Id.* ¶ 8.  Iacoviello's training and experience sufficed for him to swear out the warrants.[5]

---

[5] The Defendant may purport to disagree with the affidavit's particular description of the controlled substances and may believe that if the affiant was a doctor, the descriptions would have been different.  But that is not a basis to suppress the warrants because "experts within a particular field of study do not always agree on such matters within the relevant scientific community."  *Wolfe*, 2016 WL 8310382, at *5.

### ii.    The Defendant did not—and cannot—argue that the good faith exception does not apply.

Even if the Court were to find that the search warrant affidavit did not provide probable cause for the searches, the Court should not grant the suppression motion, because of the good-faith exception.  None of the four factors that would vitiate the good-faith exception applies here.

*First*, there is no indication that Magistrate Judge Simms "wholly abandoned" her judicial role in signing these warrants or that she was not neutral when signing the warrants.  *See Perez*, 393 F.3d 457.

*Second*, the warrants were not "facially deficient" because they effectively set forth the places that law enforcement intended to search and the evidence law enforcement could seize.  *Id.*

*Third*, the affidavit was not "so lacking in indicia of probable cause" that the Court should suppress the warrants.  Rather, as described above, the affidavit contained probable cause to support returning of these warrants.  In analyzing this factor, *United States v. Wellman* is instructive.  663 F.3d 224 (4th Cir. 2011).  The *Wellman* court ruled that the affidavit did not lack indicia of probable cause because the affiant had "provided information in the application regarding his background as an investigator, which established his experience in dealing with crimes involving child pornography."  *Id.* at 229.  The opinion also observed, "the dates provided in the search warrant application demonstrate that the affidavit was not a hastily-assembled document based on a single tip, but was the product of a six-week investigation."  *Id.*  In this case, the affiant received his first tip in October 2020 and the warrant was executed on June 1, 2022.

*Fourth*, the Defendant does not argue that Iacoviello misled the magistrate judge in any respect—let alone *knowingly* did so.

## II. *Franks* Hearing

### A. Legal Standard

A "presumption of validity" attaches "to the affidavit supporting the search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). Because of this presumption of validity, "[a]n accused is generally not entitled to challenge the veracity of a facially valid search warrant affidavit." *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011).

A *Franks* hearing offers criminal defendants a narrow way to challenge the validity of a search warrant. To receive such a hearing, "the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171. If—as is the case here—a defendant seeks a *Franks* hearing based on a purported omission in the affidavit, the "heavy burden is even harder to meet." *United States v. Haas*, 986 F.3d 467, 474 (4th Cir. 2021) (denying *Franks* hearing where affiant omitted criminal history of FBI informant whose information was included in the affidavit). "In that situation, a defendant must provide a substantial preliminary showing that (1) law enforcement made an omission; (2) law enforcement made the omission 'knowingly and intentionally, or with reckless disregard for the truth,' and (3) the inclusion of the omitted evidence in the affidavit would have defeated its probable cause." *Id.* (quoting *United States v. Colkley*, 899 F.2d 297, 300-01 (4th Cir. 1990)). "If the district court finds that a defendant has made this threshold showing, it must hold a *Franks* hearing to develop evidence on the affidavit's veracity." *Id.*

### B. The Defendant has failed to establish that Iacoviello "knowingly and intentionally, or with reckless disregard for the truth" omitted his educational and/or practical experience.

The Court should deny the Defendant's motion for a *Franks* hearing because, at minimum, she has failed to satisfy the second prong of the three-part test. Because courts do not expect

affiants to include "every piece of information gathered in the course of an investigation" in an affidavit, "the 'mere fact' that the agent did not include every piece of information known about [the defendant] in the affidavits 'does not taint the[ir] validity.'" *Haas*, 986 F.3d at 475 (quoting *Colkley*, 899 F.2d at 300-01); *see also id.* ("And the mere fact that information was omitted from an affidavit cannot alone show recklessness or intentionality."). Moreover, the caselaw does not require an agent to set forth all of his credentials in an affidavit. *E.g.*, *United States v. Nagy*, 345 F. Supp. 3d 887, 893 (N.D. Ohio 2018) (declining to impose "requirement for an affiant to disclose training and experience with use of thermal imaging equipment" in order to describe his use of such equipment; noting the Sixth Circuit has explained "[t]he affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added") (citation and quotation marks omitted)).

Thus, to satisfy the "intentionally prong," the Defendant needed to establish that Iacoviello knowingly and intentionally, or with reckless disregard for the truth omitted information related to his educational or professional experience "to mislead the magistrate judge or in reckless disregard of whether it would be misleading." *Id.* Iacoviello would have acted with "reckless disregard" only if he "fail[ed] to inform the magistrate of facts [he] subjectively knew would negate probable cause." *Id.* Indeed, even if this Court were to find that the magistrate judge should have ordered Iacoviello to include more details about his training and qualifications, "the magistrate judge's arguable failure to do so . . . does not justify" this Court's ordering a *Franks* hearing. *United States v. SDI Future Health, Inc.*, No. 2:05CR00078 PMPGWF, 2006 WL 4459984, at *25 (D. Nev. Aug. 25, 2006). Instead, the Defendant must make "a substantial showing . . . that the magistrate judge was misled" by statements "which the Government knew were false or should have known were false but for its reckless disregard for the truth." *Id.*

Nowhere in her motion does the Defendant argue that Iacoviello intentionally sought to mislead Judge Simms.  The Defendant merely argues that the type of allegations that Iacoviello made "requires a demonstrated, long-term expertise in medicine and opioid addiction treatment; qualifications that TFO Iacoviello does not appear to even remotely possess."  ECF No. 39 at 7. While the Defendant may wish that Iacoviello had included his educational and professional history in the affidavit, she does not assert—even in conclusory form—that he omitted this information intentionally.  The argument also ignores that Iacoviello explained that information in the affidavit included "information provided to your affiant by other law enforcement officers and agents, information provided by cooperating individuals, and other information gathered during the course of this investigation."  Ex. A, ¶ 8 (Iacoviello Affidavit in support of search warrants).

Therefore, the Court should deny the Defendant's motion for a *Franks* hearing.

Even if the Court were to find that the Defendant satisfied the second prong, a *Franks* hearing is not warranted here because the Defendant has not explained—because she cannot— how inclusion of Iacoviello's educational and professional history "in the affidavit would have defeated its probable cause."  *Haas*, 986 F.3d at 474.  The Defendant seems to suggest that the affidavit needed a *Daubert*-level of proof, but "*Franks* is about whether a defendant has made allegations sufficient to merit a hearing regarding the validity of a search warrant affidavit.  These cases have little to do with one another; certainly, we have never held that a search warrant affidavit must always be supported by evidence admissible under *Daubert*."  *United States v. Pirosko*, 787 F.3d 358, 370 (6th Cir. 2015); *United States v. Palmer*, No. 4:14] CR 175 AGF/DDN, 2016 WL 11653560, at *10 (E.D. Mo. Nov. 4, 2016) ("The officers may not have had training in organic chemistry or molecular structure, but they attested that they researched various synthetic cannabinoids and relied on materials produced by the DEA Office of Diversion Control, the DEA

Deputy Administrator, drug user internet forums, Wikipedia, and several unidentified studies and surveys.  While these sources might not survive a *Daubert* hearing, they could provide a basis to support the affiants' scientific statements to a 'fair probability.'") (citations omitted).  Here, Iacoviello similarly described what he had learned through research and experience, such that a *Franks* hearing is unwarranted.

## CONCLUSION

As discussed herein, the Court should deny the Defendant's motion suppress and in the alternative for a *Franks* hearing, ECF No. 39.

Respectfully submitted,

Erek L. Barron
United States Attorney

By:  _____/s/_____

Christopher Sarma
Elizabeth Wright
Assistant United States Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 23, 2024, I caused the foregoing to be electronically filed through this Court's CM/ECF system, which will send notification of such filing to all parties.

<u>/s/ Christopher Sarma</u>
Assistant United States Attorney